NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-63

DWIGHT O. FRANCO

VERSUS

PATRICIA FRANCO

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 92-1885
HONORABLE LILYNN ANNETTE CUTRER, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and
Michael G. Sullivan, Judges.

AFFIRMED.

Michael R. Garber
P. O. Box 597
Lake Charles, LA 70602
Telephone: (337) 494-5500
COUNSEL FOR:
    Defendant/Appellant - Patricia Franco

Frank Alton Granger
1135 Lakeshore Drive - 6th Floor
Lake Charles, LA 70601
Telephone: (337) 439-2732
COUNSEL FOR:
    Plaintiff/Appellee - Dwight O. Franco

**THIBODEAUX, Chief Judge.**

Appellant, Patricia Franco (Mrs. Franco), seeks review of the trial court's judgment, which reduced her final periodic support award from $800.00 monthly to $400.00 monthly. Mrs. Franco's ex-husband, Dwight O. Franco (Mr. Franco), sought the reduction, alleging the lack of means to continue paying the support award due to his increased living expenses and Mrs. Franco's purported ability to gain employment to support herself. We find no abuse of discretion in the trial court's judgment and affirm.

## I.

## ISSUES

Did Mr. Franco show the necessary material change in either his or Mrs. Franco's circumstances in order to achieve a modification of the final periodic support award?

## II.

## FACTUAL BACKGROUND

The Francos were married in 1974, and, in 1977, had one son, Dwight Franco, Jr. (Dwight, Jr.). Mrs. Franco worked prior to the marriage doing clerical work, but stopped working shortly after getting married. Mr. Franco provided the sole support for the family throughout the marriage.

In 1992, after eighteen years of marriage, Mr. Franco sought a divorce. Mrs. Franco continued to live in the marital home with their minor son, who at the time was fourteen years old. Prior to the rendering of the divorce judgment, she was awarded interim periodic support (formerly alimony pendente lite) in the amount of $250.00 per month and Mr. Franco was ordered to maintain the mortgage payments

on the family home, for a total interim support payment of $889.00 per month.[1] Child support was set at $423.00 per month, based upon Mr. Franco's gross income, at the time, of $3,300.00 per month and Mrs. Franco's ability to work a minimum wage job at a gross rate of $737.00 per month. The final divorce judgment, which was granted later that year, awarded Mrs. Franco $800.00 per month in permanent periodic support, which continued to include the monthly mortgage payment. Child support was continued at the same rate. Mr. Franco testified that the permanent support award was a stipulated amount that was agreed upon in order to insure that the mortgage on the family home would be paid as long as their son was a minor.

In 2006, Mr. Franco filed a Rule to Terminate or Reduce Permanent Alimony. Fourteen years had passed since the final periodic support award had been rendered. Their son was then twenty-eight years old and was employed and supporting himself. The marital home had been sold and Mrs. Franco lived and shared expenses with her son in a house that he was renting. Mr. Franco, then fifty-three years old, had been re-married approximately four years and lived with his wife and her three minor children.

At the hearing on the modification of the support award, Mrs. Franco did not appear to testify. The only witnesses were Mr. Franco and the Francos' son, Dwight, Jr., who offered testimony regarding his income, his mother's contribution to their shared household, and his knowledge of her past work history and current health. Specifically, he testified that he was employed at a car dealership, Bolton Ford, as a porter. He stated that he earns $7.00 per hour, resulting in net wages of approximately $383.00 per week, or $1,532.00 per month. According to his testimony, his monthly household expenses, which include the household utilities,

---

[1]The record suggests that the mortgage payment on the marital home was approximately $668.00 per month.

food, and rent of $700.00, total approximately $1,300.00. He stated that his mother contributes $800.00 per month to the household expenses and performs all of the household cleaning and cooking.

Regarding his mother's work history and current capacity for employment, Dwight, Jr. testified that Mrs. Franco was a stay-at-home mother during his school years and that she never resumed working outside of the home once he reached adulthood. He testified that his mother relies on him for transportation because she does not drive and does not own a vehicle or a driver's license. Moreover, he stated that his mother rarely ventures outside of their home for any purpose, having only left the house six times in the past year, each time relying on him for transportation. Three of those outings, he testified, were for trips to the local charity hospital, W.O. Moss Regional Medical Center (Moss Regional), for medical treatment, which involved diagnosis and treatment for a stroke. He testified that as a result of the stroke, her right arm and leg were "twisted." Consequently, he and an uncle had to assist with the household cleaning and cooking for a period of time. He also testified that his mother had attended physical therapy for approximately one week after the detection of the stroke and had follow-up visits with doctors at Moss Regional. However, no medical records were provided indicating the effect this stroke had on her or indicating a course of treatment rendered to her after it was detected. Dwight, Jr. also testified that his mother's condition had improved in the few months since the stroke was detected, but he opined that his mother is not capable of living alone or working.

Mr. Franco offered contradictory testimony regarding this description of Mrs. Franco. He testified that he had no knowledge of Mrs. Franco having suffered a stroke and stated that although Mrs. Franco may not have been in current

3

possession of a driver's license, she drove during their marriage and opined that she remained capable of driving, as well as working. He also testified that the stipulated payment of $800.00 was no longer necessary since the family home had been sold and Dwight, Jr. no longer relies on either of his parents to provide a home for him. He explained that the family home was ultimately sold in 2004, and the equity of about $10,000.00 from its sale had been split between him and Mrs. Franco.

Mr. Franco testified that his current average gross monthly income is $5,795.00, and his average net monthly income is $3,434.32. He further testified that, although his current wages reflect average additional income earned due to overtime work, his base wage is lower—$27.35 per hour or $55,000.00 per year, approximately $20,000 less than what his overtime income reflects. Mr. Franco contends that his monthly expenses, which include the current spousal support payment of $800.00 to his ex-wife, total $4,483.31, an amount exceeding his current average net monthly income by almost $1,000.00. He states that he covers his shortfall in income by loans and credit cards, which cost him $350.00 monthly. He explained that as of the date of the hearing, he was two months behind on the spousal support payments, after having recently secured a loan to pay prior arrears to Mrs. Franco, which totaled $7,200.00 as of late 2005. The $7,200.00 arrears occurred, according to him, because of expenses he accrued while anticipating a job transfer to Corpus Christi, Texas, which required him to support his family, which had already relocated to Corpus Christi, as well as maintaining a home in Lake Charles, where he was still being required to work. The transfer ultimately did not take place, and his family has since returned to Lake Charles, where they now reside in a new home, purchased a few

4

months after he filed the rule at issue. He has a current monthly mortgage note of $1,473.00.[2]

Evidence submitted regarding Mrs. Franco's income and expenses was limited to her responses to Interrogatories and her Affidavit Declaring Income and Expenses. The Interrogatories show that Mrs. Franco was fifty-seven years old as of hearing time, has an eleventh grade education, and has been unemployed since marrying in 1974. Mrs. Franco's responses to the Interrogatories also state that her only sources of income are the permanent support payment of $800.00 per month and $200.00 per week ($800.00 per month) payments received from her son. Her Affidavit Declaring Income and Expenses reflects a total gross monthly income of $1,700.00, and an itemized list of monthly expenses totaling, $1,550.00. She also owes a total of $900.00, in medical bills.[3] Mrs. Franco itemized her monthly expenses as follows: rent at her son's home in the amount of $700.00, food and household supplies totaling $400.00, utilities in the amount of $190.00, miscellaneous clothing, transportation, and personal/grooming costs, totaling $260.00.

Regarding the condition of her health since the 1992 divorce, Mrs. Franco stated in her Interrogatory responses that she is taking the medications triamteren, potassium, and amitriptyline, but did not elaborate on the cost of the medication, the purpose or period of time they will be needed, nor any illnesses or conditions from which she might be suffering. The only other information offered regarding her medical status, other than Dwight, Jr.'s testimony, was provided via

---

[2]The monthly mortgage payment is included in the calculation of the total expenses set forth in his Affidavit of Income and Expenses.

[3]Mrs. Franco listed an outstanding hospital bill from Moss Regional in the lump sum amount of $900.00 in her list of monthly living expenses, but did not provide the monthly payment due; accordingly, although we acknowledge the existence of the debt, without more information, we excluded this total cost from her monthly living expenses total as it would inaccurately inflate her *monthly* expense total.

medical records of treatment rendered to her in March and April of 2006 at Moss Regional. The records showed that on March 18, 2006, she arrived at the emergency room of Moss Regional, complaining of the onset of right arm and leg weakness on March 15, 2006, and complaining of having taken too many herbs. She was observed as being anxious and ultimately was diagnosed with "hypertension" as well as an "enlarged uterus," the cause of which is not clear from the records provided. After her blood pressure was regulated, tests were run, and she was released. According to the records provided, she then returned to the emergency room on April 7, 2006, stating that she was out of her blood pressure medicine, that her blood pressure was elevated, and that her "nerves were bad." The final diagnosis was "hypertension/anxiety" and, again, "uterine hypertrophy." This record also noted that she stated that her prior complaints of right side weakness had resolved.

Mrs. Franco's records also consisted of a report on a CT scan of her head that had been taken during her emergency room visit in March. It noted the finding of a one centimeter lacunar infarct (stroke) adjacent to the body of the left lateral ventricle of her brain. The only information offered to the trial court regarding this finding consisted of a portion of a published case report, entitled "Cognitive Functioning before and after a Lacunar Infarct," that was retrieved from the internet by the attorney for Mrs. Franco from a medical journal, *Cerebrovascular Diseases*. The entire text submitted states:

> A lacunar infarct is caused by an occlusion of a small penetrating terminal branch of a major intracerebral artery. This type of stroke is usually located in the deep white matter of the brain or in the brain stem and can lead to over 20 different syndromes. In general, recovery of the neurological deficit is quite good, although several patients report subjective problems in regaining their premorbid level of functioning. Subtle but persistent cognitive deficits have been suggested to cause these difficulties, but are difficult to assess with certainty, since the premorbid

level of functioning is unknown and can only be estimated indirectly. Here, we report a unique case in whom neuropsychological performance before and after stroke could be compared.

(Footnotes omitted).

Mrs. Franco's lawyer argues that, based on the facts presented, she satisfied her burden of showing a continuing need for the permanent periodic support at its current rate.

III.

**LAW AND DISCUSSION**

Permanent periodic support (formerly permanent alimony) may be awarded to a spouse who is free from fault prior to the filing of divorce proceedings and who is in need. La.Civ.Code art. 111. The determination is also based on the ability of the payor-spouse to pay. *Knowles v. Knowles*, 02-331 (La.App. 3 Cir. 10/2/02), 827 So.2d 642. This spousal support is limited to an amount necessary for maintenance, as opposed to an amount calculated to continue an accustomed standard of living. *See Vesper v. Vesper,* 469 So.2d 458 (La.App. 3 Cir. 1985). Maintenance has been deemed to include those expenses required to procure the basic necessities of life such as, food, clothing and shelter, as well as reasonable and necessary transportation expenses, medical and drug expenses, utilities and household expenses, and the income tax liability generated by the support payments. *Bernhardt v. Bernhardt*, 283 So.2d 226 (La.1973).

The factors that are considered when the final periodic support award is originally rendered are also to be considered by the court when a modification is being sought. La.Civ.Code art. 112, Comment (g). Those factors are set forth in La.Civ.Code art. 112(B), which expressly states:

7

B.  The court shall consider all relevant factors in determining the amount and duration of final support. Those factors may include:

(1) The income and means of the parties, including the liquidity of such means.

(2) The financial obligations of the parties.

(3) The earning capacity of the parties.

(4) The effect of custody of children upon a party's earning capacity.

(5) The time necessary for the claimant to acquire appropriate education, training, or employment.

(6) The health and age of the parties.

(7) The duration of the marriage.

(8) The tax consequences to either or both parties.

Permanent periodic support may be modified or terminated when the following conditions have been established:

### Art. 114.  Modification or termination of award of periodic support

An award of periodic support may be modified if the circumstances of either party materially change and shall be terminated if it has become unnecessary.  The subsequent remarriage of the obligor spouse shall not constitute a change of circumstance.

The burden rests with the party seeking the modification to show that a material change in the circumstances of either party has occurred. *Voyles v. Voyles*, 04-1667 (La.App. 3 Cir. 5/4/05), 901 So.2d 1204, *writ denied*, 05-1270 (La. 12/9/05), 916 So.2d 1059.  Once the mover establishes that a material change has occurred, the burden then shifts to the party opposing the modification to prove a continuing need, based on relevant factors, as discussed in La.Civ.Code art. 112. *Mizell v. Mizell*,

40,601 (La.App. 2 Cir. 1/25/06), 920 So.2d 927, *writ denied*, 06-2884 (La. 3/9/07), ___ So.2d ___.

In this case, Mr. Franco sought the support payment reduction based on the fact that he, as well as his ex-wife, have experienced material changes in their living circumstances since the permanent award was rendered in 1992. He established that Mrs. Franco is no longer the head of household in the family home. Instead, she shares living expenses with their adult, employed son in a home that the son rents. He established that the family home that she and their son continued to occupy after the divorce had been sold and that the equity had been divided between him and Mrs. Franco. Mr. Franco established that he is remarried and sharing a recently purchased home with his wife and three minor step-children. Finally, he showed that, although his income has increased since 1992, his monthly expenditures have as well, such that his expenses exceed his monthly net income. We note that although Mr. Franco's remarriage, alone, is not considered a material change in circumstances sufficient to justify a modification in the spousal support award, he is not required to put his life on hold, and this change and the increased living expenses accrued as a result of it, may be considered as relevant factors, pursuant to La.Civ.Code art. 112, to consider when evaluating his means to provide Mrs. Franco with support. Considering this, as well as the change in his ex-wife's circumstances since 1992, we find that Mr. Franco met his burden of showing material changes in both of their circumstances. The burden shifted to Mrs. Franco to prove the need for the continued support at its current rate.

An evaluation of the facts presented by Mrs. Franco leads us to conclude that she did not successfully satisfy the burden necessary to maintain the permanent periodic support award at $800.00 per month. First, we note that the record reflects

9

that Mrs. Franco did not appear at the hearing nor did she appear to testify. No explanation was offered regarding her absence. Rather, on her behalf, the Francos' son provided testimony consisting of his observations and opinions as to his mother's physical health, financial status, and her capacity to work in order to produce an income for herself. Considering the relevant factors as illustrated in La.Civ.Code art. 112, we find that his testimony, along with his mother's Interrogatory responses, established that she has not been employed outside of the home since 1974—a total of thirty-two years. It was also shown that she is now in her late fifties and possesses an eleventh grade education, although she worked in a clerical capacity prior to getting married. Regarding her medical condition, which she argues is a barrier to her gaining employment, the medical records introduced show a history of hypertension and an enlarged uterus and that a lacunar infarct was detected in her brain in early 2006, denoting the fact that she had indeed suffered a stroke. However, there were no medical records nor expert medical testimony introduced, indicating the effects that the stroke or any of these other conditions have had, or may have, on her capacity to gain or maintain employment. We also find that Mrs. Franco's itemization of her rent, household expenses, utilities, and food expenses mirror those of her son's, in large part, and therefore, likely overstate her actual share of those expenses.

The trial court possesses great discretion in making periodic support determinations, and its judgment is not to be disturbed absent a finding of a manifest abuse of discretion. *Knowles*, 827 So.2d 642. Accordingly, based on the facts presented, we find no abuse of discretion in the judgment of the trial court and affirm the ruling, reducing Mrs. Franco's permanent periodic support award to $400.00 per month.

10

IV.

## **CONCLUSION**

The judgment of the trial court, reducing Patricia Franco's permanent periodic support award to $400.00, is affirmed. All costs of this appeal are assessed to defendant-appellant, Patricia Franco.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules—Courts of Appeal.